UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17-C-4902 |
| | ) | |
| vs. | ) | Hon. John J. Tharp, Jr. |
| | ) | |
| CITY OF CHICAGO, ET AL., | ) | Hon. Daniel G. Martin |
| | ) | |
| Defendants. | ) | |

<u>DEFENDANT CITY OF CHICAGO'S REPLY IN SUPPORT OF BIFURCATION</u>

Defendant City of Chicago respectfully replies in support of its' motion (R. 28) to bifurcate and stay Plaintiff's *Monell* claim.[1]

## <u>Introduction</u>

Plaintiff characterizes the City's motion as "blind," "premature" and "rel[ying] on boilerplate arguments without addressing the specificities of" this case or "the narrow nature of the *Monell* discovery Plaintiff ... intends to pursue..." Response, R. 38, p. 1, 3. Plaintiff claims that a "public record" supports his *Monell* claims and makes *Monell* discovery largely unnecessary and that bifurcating his *Monell* claim therefore "would be a waste of judicial resources." *Id.*, p. 4-11.

These contentions are without merit. Far from failing to meaningfully address Plaintiff's *Monell* allegations, the City quoted those allegations verbatim in its motion. Motion to Bifurcate, R. 28, p. 12. By contrast, Plaintiff never quotes his own *Monell* allegations or acknowledges the plain implications of those allegations.

---

[1] Defendant Officers approve of, and adopt, the City's motion to bifurcate and stay.

R. 38, *passim*. Plaintiff instead attempts to recast his *Monell* claim as a relatively small addition to his individual claims.

This ruse is transparent. Plaintiff's Response is a classic Trojan Horse. By avoiding his own *Monell* allegations and the plain implications thereof, plaintiff hopes to camouflage the substantial discovery burden and prejudice that necessarily accompanies his *Monell* claim and thereby avoid bifurcation and a stay. Nothing makes this clearer than the enormous breadth of the "*de facto* policies" alleged by Plaintiff: a) unreasonable Taser use "against suspects that pose no threat or are only passively resisting, causing ... great pain" or "death"; b) "failure to properly train, supervise, investigate or discipline ... Officers" regarding Taser use resulting in Taser use "as a tool of convenience or punishment"; c) a "code of silence whereby ... officers refuse to report or otherwise cover up ... police misconduct, and/or the fabrication, suppression, and destruction of evidence..."[2]; and d) "failure to properly train, supervise, discipline, transfer, monitor, counsel ... control ... officers, particularly those ... repeatedly accused of" misconduct. Complaint, R. 1, ¶ 36.

It is impossible to reconcile these allegations with plaintiff's claim that there will be "little, if any, additional [*Monell*] discovery" or with Plaintiff's other arguments against bifurcation. R. 38, p. 5. In fact, massive discovery, in the form of both document production and Rule 30(b)(6) depositions, is inevitable if and when Plaintiff's *Monell* claim proceeds. Plaintiff alleges *de facto*, not actual, policies, Complaint, R. 1, ¶ 36, which means myriad instances of alleged misconduct and/or

---

[2] Plaintiff alleges the code of silence includes remaining silent or lying during "official investigations," "Grand Jury proceedings" and "criminal cases." Complaint, R. 1, ¶ 36(c).

mismanagement will have to be assessed to determine whether such *de facto* policies exist, which the City denies, or Plaintiff is offering unrepresentative, random incidents and snippets of information that do not prove such policies. The number of topics and subtopics within Plaintiff's own *Monell* allegations makes clear that should Plaintiff seek, in addition to burdensome document production, Rule 30(b)(6) deponents on each of these topics, the *Monell* discovery in this litigation will require not only a great amount of time and resources, but will also likely cause discovery to extend far into the future.

Even a cursory review of Plaintiff's purported "public record," most of which is inadmissible, shows that it comes nowhere close to proving his allegations much less providing a sufficient record upon which to adjudicate those allegations. This is especially true of the Taser-related allegations that are the heart of Plaintiff's *Monell* claim. Plaintiff's "public record" identifies very few specific alleged incidents of Taser misuse, none of which are admissible, which is no doubt why Plaintiff quietly acknowledges that he will need "documents related to CPD's official Taser policies, training program and any investigations into Taser ... deployments" and depositions of persons vaguely described as the Defendant Officers' "supervisors" but who clearly are far more senior than the line supervisors to whom the Defendant Officers report. R. 38, p. 10. Plaintiff plainly intends an enormous amount of Taser related *Monell* discovery, a stark fact that no amount of downplaying can obscure. The same is true of Plaintiff's other *Monell* allegations. And Plaintiff discusses only *his* ostensible *Monell* discovery plan and never

addresses the burden on the City of responding to his *Monell* claim. Tellingly, Plaintiff cites no case in which bifurcation was denied because a "public record" made *Monell* discovery largely unnecessary.

Plaintiff's similarly vastly understates the unfair prejudice of a unitary proceeding, particularly for Defendant Officers. Plaintiff asserts that the *de facto* policies he claims were "a moving force" and "direct and proximate cause of the [Defendant Officers'] unconstitutional acts" and his injuries. Complaint, R. 1, ¶ 38. At a unitary trial, Plaintiff will try to prove such *de facto* policies through evidence of other alleged incidents of misconduct, all or very nearly all not involving Defendant Officers, and then argue that the Defendant Officers' alleged actions were caused by, i.e., were of a piece with, such other alleged misconduct incidents. It blinkers reality to suggest that jury instructions will protect the Defendant Officers from ruinous unfair prejudice; to the contrary, they will effectively be stripped of the protections of Fed. R. Evid. 404(b) just when those protections are needed most.

This case remains indistinguishable from *Golatte*: Plaintiff cannot prevail under *Monell* without prevailing against the Defendant Officers – a basic premise of the City's motion that Plaintiff all but concedes – and "[b]ifurcation is appropriate ... because it will conserve ... resources and minimize potential prejudice against the defendants, but will not prejudice" Plaintiff. *Golatte*, 17 C 929, R. 28, Ex. A, p. 2.

### Brief Additional Background

Notably, Plaintiff does not contend, at least not generally, that Taser use against an actively resisting suspect, much less an assailant such as Plaintiff was,

4

is unconstitutional. Complaint, R. 1, *passim*; *see also*, *e.g.*, *Abbott v. Sangamon County*, 705 F.3d 706, 727 (7th Cir. 2013)(Taser use "against an actively resisting suspect" generally held to be "constitutionally reasonable" or to "not violate clearly established law"). Remarkably, Plaintiff, a 6' 1," 350 lb. former college football lineman, admitted in the underlying criminal trial that he knowingly and actively resisted Defendant Officers – a fact omitted from his Response. Among other things, Plaintiff admitted that it was reasonable in light of his own activities for Defendant Officers Francone and Zuniga to assume that he had a gun, that he understood that Defendant Officers Francone and Zuniga were police officers and were trying to arrest him and that he ignored multiple police commands for a period of minutes and actively resisted. Jeffrey Smith Testimony, *People v. Smith*, 15 CR 18796, Ex. A hereto, p. 28 ln. 24 - p. 29, ln. 11; p. 30, lns. 20-22; p. 50, ln. 17 - p. 51, ln. 1; p. 54, ln. 22 - p. 55, ln. 9; p. 58, lns. 1-5; p. 63, lns. 3-8.[3]

## Argument

Plaintiff argues: 1) bifurcation would waste judicial resources because "a strong public … record available to all" renders *Monell* discovery largely unnecessary, R. 38, p. 3-11; 2) bifurcation would be duplicative and unduly burdensome, *id.*, p. 11-14; 3) the non-economic benefits of plaintiff's *Monell* claim and pragmatism support a unitary proceeding, *id.*, p. 14-17; and 4) Plaintiff would be prejudiced while Defendants would not. *Id*, p. 18-21. For the following reasons, the City respectfully requests that the Court reject these contentions.

---

[3] In responses to requests to admit, Plaintiff admits that the criminal trial transcript reflects the above cited testimony but denies much of the substance of that testimony, denying, for example, that he refused to follow police commands and actively resisted.

## A. Plaintiff Must Prevail Against Defendant Officers To Prevail Under *Monell*

As a threshold matter, Plaintiff all but concedes that a fundamental precondition for bifurcation – that resolving the individual claims first offers the prospect of considerable savings because *Monell* proceedings will be unnecessary if Plaintiff loses – is satisfied here.  Here, as in *Golatte*, "the crux of ... [Plaintiff's] ... complaint is that [he was harmed because] the Officer Defendants used excessive force and falsely arrested" him and his "*Monell* claim is premised on the notion that the City encouraged the [o]fficers' unlawful conduct through its policies and practices," not that those policies and practices harmed him independently. *Golatte*, 17 C 929, R. 39, p. 2-3; Complaint, R. 1, ¶ 38.  Thus, Plaintiff cannot prevail under *Monell* without "first establish[ing] that the Officer Defendants violated his constitutional rights," *Golatte*, 17 C 929, R. 39, p. 2, and therefore, resolving the individual claims first may well make expensive *Monell* proceedings unnecessary.[4]

Plaintiff does not dispute this except to briefly suggest: a) "[a] verdict in favor of individual defendants would not necessarily be inconsistent with a plaintiff's verdict on a distinct *Monell* claim," R. 38, p. 13 (*citing Thomas v. Cook County Sheriff's Dep't.*, 604 F.3d 293, 305 (7th Cir. 2010); *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015)); and b) "a *Monell* verdict without a verdict against" the Defendant Officers is a "distinct possibility" if the Defendant Officers' qualified immunity defense is "sustained."  *Id.* (*citing Estate of McIntosh v. City of Chicago*,

---

[4] The prospect that *Monell* proceedings will prove unnecessary is especially great here, where Plaintiff already has testified to active resistance of the Defendant Officers.

2015 WL 5164080, at *7 (N.D. Ill. Sept. 2, 2015); *Estate of Loury v. City of Chicago*, 2017 WL 1425594 at *3 (N.D. Ill. Apr. 20, 2017)).

These contentions are without merit. *Thomas* and *Swanigan* involved claims or possible claims that alleged policies caused harm independently of the individual defendants' actions and are thus inapposite here, where Plaintiff alleges no such "distinct" *Monell* claim. *Thomas,* 604 F.3d at 305; *Swanigan*, 775 F.3d at 962. The possibility that this Court might find that the Defendant Officers violated Plaintiff's rights but are entitled to qualified immunity, discussed in *Estate of McIntosh*, 2015 USDist.LEXIS 116780 at *26 - *28 and *Estate of Loury*, 2017 USDist.LEXIS 60459 at *8 - *10, still requires that Plaintiff prove the Defendant Officers violated his rights and is in any event addressed by the City's consent to judgment under such circumstances. R. 28, Ex. B, ¶ 5. This eliminates any "issue ... that inconsistent verdicts will arise due to the ... Officer Defendants['] ... qualified immunity defense," *Golatte*, 17 C 929, R. 39, R. 28, Ex. A, p. 3, and "on balance," under such circumstances, "bifurcating the *Monell* claim ... would promote ... efficiency and judicial economy." *Horton v. City of Chicago*, No. 2016 USDist.LEXIS 9478 at *14-*15 (N.D. Ill. January 26, 2016).

### B. Bifurcation Will Be Highly Efficient And Conserve Substantial Resources

Plaintiff argues that the City's assertion that *Monell* discovery "will be ... extremely costly, burdensome, and time consuming" is "without any basis" because the parties have not yet exchanged discovery requests or discussed discovery. R. 38, p. 4. Plaintiff contends that his *Monell* claim is "limited in scope" and discovery

7

thereon will be largely unnecessary because a "public record" sets forth "[t]he vast majority of the proof" (*id.*) regarding Plaintiff's *Monell* claims on: a) "the issue of Tasers," *id.*, p. 8-10; b) "the issue of the failure to discipline" officers, *id.*, p. 10-11; and c) the "code of silence." *Id.*, p. 5-8. These contentions are without merit.

Plaintiff's assertion that his *Monell* claim is "limited" because it is "focus[ed] on the training of Defendant Al Farah on the use of Tasers, the police code of silence, and the failure to discipline the Defendants for ... misconduct" is incorrect. *Id.*, p. 4. As noted *supra*, Plaintiff's actual *Monell* allegations are far broader and not limited to Defendant Officers.[5] Significantly, plaintiff cites no case in which an ostensible "strong public evidentiary record" was deemed sufficient to prove a *Monell* claim or forestall bifurcation.[6] To the contrary, in *Kitchen v. Burge*, 10 C 04093, R. 399 (Nov. 2, 2012) Order, attached to Motion, R. 28, as Exhibit C, this Court rejected the very similar argument that little if any *Monell* discovery would be necessary because of discovery already performed in three prior "Burge" cases, R. 28, Ex, C, p. 11-12, and granted bifurcation. *Id.*, p. 23-24. Likewise here,

---

[5] Indeed, Plaintiff's "limited scope" version of his *Monell* claim is not a *Monell* claim at all, or at least not much of a *Monell* claim, because it is so centered on the Defendant Officers.

[6] Plaintiff's citations for the proposition that "bifurcation is not appropriate where the anticipated *Monell* discovery is limited in scope" (R. 38., p. 4-5) are inapposite because, as detailed *infra*, the *Monell* discovery burden here is much greater. *See Cadle v. City of Chicago*, 2015 U.S. Dist.LEXIS 148344 at *5-*6 (N.D. Ill. November 2, 2015)(*Monell* discovery limited to two depositions (one 30(b)(6)) and discreet document sets); *King v. Evans*, 2015 U.S. Dist.LEXIS 93861 at *5 (N.D. Ill. July 17, 2015)(*Monell* claim to be proved "largely through ... witnesses who otherwise would testify ... against the individual Defendants"); *Allison v. Gallagher*, 2012 U.S.Dist.LEXIS 144138 at *4-*5 (N.D. Ill. October 5, 2012)(*Monell* discovery "does not involve extensive document production" and will involve "only a few depositions of supervisory personnel"); *Cadiz v. Kruger*, 2007 U.S.Dist.LEXIS 88458 at *12-*13 (N.D. Ill. November 29, 2007)(plaintiff identified "nearly 100 potential witnesses" but only "12-13" "would speak to the *Monell* claim" and "only a few of those" were "relevant solely to the *Monell* claim.").

Plaintiff's *Monell* allegations have made clear from the outset that immense discovery will be necessary regarding each *de facto* policy alleged by Plaintiff, his "public evidentiary record" notwithstanding.

### 1. Alleged *De Facto* Taser Policies

Plaintiff alleges *de facto* policies of using Tasers unnecessarily, resulting in "great pain" or "death," and of "fail[ing] to properly train, supervise, investigate or discipline" officers regarding Taser use. Complaint, R. 1, ¶ 36(a), (b). Discovery and trial of these allegations will be extremely burdensome as Taser policies and training programs and numerous individual instances of Taser use – over a period of years for a force of over 12,000 Officers (*see*, *e.g.*, DOJ Report p. 53, 71) – will have to be discovered, litigated and opined upon by experts. Plaintiff claims he can avoid such considerable work by simply presenting "the findings of the Mayor's Task Force ["PATF Report," Ex. B hereto] and the Department of Justice ["DOJ Report," Ex. C hereto] … [regarding Tasers and] … the testimony of ... Defendants and perhaps their supervisor." R. 38, p. 8-9. This contention cannot survive even moderate scrutiny. As even Plaintiff tacitly admits, massive discovery is inevitable.

Neither the DOJ Report nor the PATF Report, even assuming those documents are admissible,[7] comes anywhere close to establishing Plaintiff's alleged *de facto* Taser policies much less providing a sufficient record upon which to adjudicate such allegations. The PATF Report does not examine any specific Taser

---

[7] The City respectfully submits that neither the PATF Report nor the DOJ Report are admissible, *see*, *e.g.*, Fed. R. Evid. 403, 407, 803(8), but acknowledges that the court in *Cazares v. Frugoli*, 2017 USDist.LEXIS 49938 at *9 n. 5, *58 (N. D. Ill. March 31, 2017) took judicial notice of, and considered, the PATF and DOJ Reports.

use incident and, as a general matter, "...did not conduct a detailed analysis of CPD's use of force practices..." *See* PATF Report, p. 19 and *passim*. The DOJ Report assessed just 425 non-lethal force incidents that occurred between January, 2011 and April, 2016. DOJ Report, p. 21.[8]  Only approximately sixteen specific incidents of Taser use and one incident of threatened Taser use are discussed,[9] *id.*, p. 32-37, 43, *passim*, and in five such incidents, the DOJ was unable to determine whether the Taser use was appropriate. *Id.*, p. 37.

The information necessary to assess whether such Taser incidents are random or representative is largely omitted, including: a) how many of the 425 incidents involved Taser use, b) the total number of Taser use incidents that occurred between January, 2011 and April, 2016, c) the total number of non-lethal force incidents that occurred between January, 2011 and April, 2016 and d) how the 425 non-lethal force incidents were chosen in the first place.[10]  DOJ Report, *passim*. But the fact that the cited Taser incidents are neither representative nor otherwise proof of a *de* facto policy nonetheless can be gleaned from the DOJ Report: a discussion of IPRA investigations of Taser use reflects that approximately 4,000

---

[8] The DOJ Report states that "over 425" non-lethal force incidents were reviewed, *id.*, p. 21, but the number of reviewed incidents clearly is no more, or at least not discernibly more, than 425; otherwise, the Report would cite a different number than 425.  Moreover, the number of such incidents effectively reviewed is well less than 425: "In many cases we reviewed, due to insufficient information, we were not able to determine whether the force was reasonable." *Id.*, p. 32.

[9] It is difficult to determine the precise number of Taser incidents discussed.  What is clear, however, is that the DOJ Report comes nowhere close to showing any *de facto* Taser policy.

[10] The 425 incidents are vaguely described as part of a "randomized, representative sample" but no selection methodology is disclosed. *Id.*, p. 21 and *passim*.

Taser use incidents occurred during 2009 through 2015, of which the few incidents discussed in the DOJ Report would comprise well under one percent. *Id.*, p. 53.

Not surprisingly, the DOJ Report never finds a "pattern or practice" of unreasonable Taser use much less *de facto* policies of unreasonable Taser use and failure to train and discipline regarding Taser use. *Id.*, *passim.*[11] Instead, the DOJ Report vaguely finds "reasonable cause to believe that CPD has engaged in a pattern or practice of unreasonable force ... and that deficiencies in ... [various] ... systems have contributed to" this, while never disclosing what threshold was used to determine the existence of a pattern or practice. *Id.*, p. 23.[12]

Nor do the PATF and DOJ Reports show insufficient training. Plaintiff cites only criticisms of Taser training of all officers that "the City mandated" "in response to the release of the Laquan MacDonald video in November, 2015," DOJ Report, p. 103; PATF, p. 30, cited at R. 38, p. 9, which occurred after the events at issue here. Defendant Officer Al Farah, who deployed a Taser with respect to Plaintiff, received Taser training in 2013 in the Police Academy, during which she volunteered to be tased so that she would "know the kind of force I am going to apply," and received annual Taser training thereafter. Al Farah Testimony, Ex. D hereto, p. 134-35.

---

[11] To the contrary, the DOJ Report states only that *"[s]ome* CPD Officers resort to Tasers as a tool of convenience, with insufficient concern or cogniznace that it is a weapon with inherent risks that inflicts significant pain." *Id.*, p. 33 (emphasis added).

[12] Citing cases that did not involve *Monell* claims or even § 1983 claims and are over thirty years old, the DOJ Report states only that "a specific number of incidents and statistical evidence is not required" to find "[a] pattern or practice of unreasonable force." *Id.*, p. 23-24.

11

The cited criticisms are thus irrelevant and address just one program and thus do not establish a policy of failure to train with respect to Tasers.

Implicitly acknowledging the foregoing, Plaintiff quietly, but unmistakably, admits that he in fact needs, and will take, extensive discovery, stating that he "anticpate[s]" "questioning the Defendants and perhaps their supervisor(s) ... and requesting documents related to CPD's official Taser policies, training program and any investigation into Taser gun deployments." *Id.*, p. 10. Plaintiff's request for documents relating to "*any* investigation into Taser gun deployments" (*id.*, emphasis added) seeks a vast production. The DOJ Report states that IPRA investigated all of the nearly 200 Taser uses in 2009 and that of the over 4,000 Taser uses that have occurred since 2009, IPRA has investigated every such use that was the subject of a complaint or an investigative override. DOJ Report, p. 53. At a minimum, then, Plaintiff seeks several hundred files and undoubtedly will seek further discovery of the facts underlying some portion of those files. Similarly, given that the City has employed Tasers as a use of force weapon for its officers for years, producing documents regarding Taser policies and training will likewise be very burdensome.

Plaintiff's vague reference to deposing Defendant Officer's "supervisors" is a veiled admission that he intends to depose senior and other officials. While it is difficult to see what line Sergeants could add to the Defendant Officers' testimony with respect to Tasers, it is clear that Plaintiff will need the testimony of more senior and other officials with respect to Taser policies and training and

investigations of alleged Taser misuse – otherwise the documents Plaintiff seeks will be of no use to him. Plaintiff's suggestion that "[t]he vast majority of" Taser related *Monell* discovery "will overlap with discovery related to" the individual claims is baseless. As Plaintiff's himself admits, *see supra*, "the vast majority of" Taser related *Monell* discovery will be about Taser training, discipline and use incidents that have nothing to do with the underlying events at issue and mostly occurred before Officer Al Farah even became a police officer in 2013. Plaintiff provides no support for the implied assertion that these sergeants would be "policymakers" with the foundation to testify to the relevant Taser policies and training for all applicable time periods.

Finally, Plaintiff nowhere addresses the vast burden that his Taser *Monell* allegations will impose on the City. *Kitchen v. Burge*, 10 C 04093, R. 399 (Nov. 2, 2012) Order, R. 28, Ex. C, p. 12 (considering discovery burden on City in granting bifurcation). To defend itself, the City will have to review Taser policies and training and numerous Taser use incidents and present 30(b)(6) and/or expert testimony thereon. This immense burden supports bifurcation.

## 2. Alleged *De Facto* Failure To Investigate And Discipline Misconduct Policy

Plaintiff alleges a *de facto* policy of "fail[ing] to properly ... discipline ... officers...," Complaint, R. 1, ¶ 36(d), and asserts that his "proof ... comes from the findings of the PATF and the DOJ [Reports] ... together with the disciplinary backgrounds of the officers" and that he therefore "does not plan to seek any discovery in regard to this aspect of his *Monell* claim," beyond obtaining

"Defendants' disciplinary backgrounds" and "questioning them" thereon. Rsp., R. 38, p. 10-11. Again, this contention cannot survive even moderate scrutiny.

Plaintiff is correct that the DOJ and PATF Reports contain criticisms of the system for investigating and adjudicating misconduct complaints. DOJ Report, p. 46; PATF Report, p. 14. But Plaintiff omits a critical fact: neither the DOJ Report nor the PATF Report concludes that the City has a *de facto* policy of failing to investigate and punish misconduct. DOJ Report, *passim*; PATF Report, *passim*.

And for the best of reasons: It simply does not follow from the criticisms and recommendations in the DOJ and PATF Reports that the City has a *de facto* policy of failing to investigate and punish misconduct. For example, noting that forty percent or more of complaints are not investigated because the complainant failed to provide an affidavit, the DOJ Report criticizes the affidavit requirement (even while acknowledging that it can be overridden) and recommends eliminating it. DOJ Report, p. 50-51, 154. But it does not follow from this that the City has a *de facto* policy of failing to investigate and punish misconduct. Penalties for false reports or claims are common and arguably especially necessary to protect police officers from false complaints from properly arrested persons looking for leverage or revenge. It is a crime in Illinois to file a false police report, 720 ILCS 5/26-1(a)(4), and frivolous civil filings are sanctionable. Fed. R. Civ. P. 11; Ill. S. Ct. R. 137. While these strictures certainly can be criticized, it cannot credibly be argued that such strictures show that Illinois has a *de facto* policy of not prosecuting crime or that the courts have a *de facto* policy of suppressing civil claims.

Similarly, the DOJ Report criticizes the prohibition (also subject to override) on investigating misconduct incidents that are more than five years old. *Id.*, p. 52. Again, however, it does not follow from this that the City has a *de facto* policy of failing to investigate and punish misconduct. Time limits on adversarial proceedings are common because, as the DOJ Report itself observes, with the passage of time memories may fade and evidence might be lost. *Id.*, p. 74. The general limitations period for felony prosecutions in Illinois is three years, 720 ILCS 5/3-5(b), substantially shorter than the five years during which alleged police misconduct generally may be investigated. While it can be argued that Illinois' three year limitation should be longer, it cannot reasonably be argued that such limitation shows that Illinois has a *de facto* policy of not prosecuting crime.[13]

The DOJ Report states that discipline is sought and/or imposed in a very small percentage of cases. *See*, *e.g.*, DOJ Report, p. 80. But such "small percentages ... mask a large absolute number of" officers who have been disciplined such that existing discipline practices clearly are anything but toothless. *United States v. Leon*, 468 U.S. 897, 907 n. 6 (1984)(rejecting claim that impact of exclusionary rule was "insubstantial" because "small percentages" of cases dropped due to rule "mask[ed] a large absolute number of" persons released due to rule). The 98 sustained Rule 14 (false statement) violations, nine fired officers and suspensions in 45.6 percent of cases where findings were sustained that the DOJ

---

[13] The DOJ Report's assertion of flawed investigative practices (*see*, *e.g.*, DOJ Report, p. 59-68) likewise does not show a *de facto* policy of failing to investigate and punish misconduct. Among other things, the DOJ Report fails to provide sufficient information upon which to assess whether the cited incidents are random or representative. *Id.*, p. 21, 59-68.

Report acknowledges during the five year period it reviewed (DOJ Report, p. 76, 80) flatly disprove the claim that the City has a *de facto* failure to discipline policy.

Finally, Plaintiff again fails to address the immense burden on the City of rebutting his alleged *de facto* failure to discipline policy. As the DOJ and PATF Reports reflect, the subject matter is vast. At a minimum, the City will have to review a great many disciplinary files and related policies and documents and present fact and expert testimony thereon. Such burden supports bifurcation. *Kitchen v. Burge*, 10 C 04093, R. 399 (Nov. 2, 2012) Order, R. 28, Exhibit C, p. 12.[14]

### 3. Alleged *De Facto* Code Of Silence Policy

Plaintiff alleges a "code of silence, whereby ... officers refuse to report [and] cover up ... misconduct...," Complaint, R. 1, ¶ 36(c), that is "established ... through admissions by Chicago policy makers, jury verdicts and judicial opinions." R. 38, p. 5. Plaintiff states discovery for this allegation will consist of "limited questions" of "Defendants and other police witnesses." *Id.* This contention is without merit.

Far from supporting Plaintiff, many of his cited decisions actually support the City because the courts relied heavily on extensive expert testimony – exactly the sort of highly burdensome discovery that may well be avoided here by bifurcation – to deny summary judgment and allow code of silence claims to proceed. *Obrycka v. City of Chicago*, 2012 USDistLEXIS 22818 at *20 - *26 (N.D. Ill. February 23, 2012)(relying heavily on opinions of two experts); *Cazares v.*

---

[14] Not surprisingly, Plaintiff states only that he "does not plan" to seek discovery for this aspect of his *Monell* claim beyond questioning the Defendant Officers and obtaining their disciplinary histories. R 38, p. 11 (emphasis added). It is difficult to believe that Plaintiff will adhere to this given the inadequacy of his public record.

*Frugoli*, 2017 U.S.Dist.LEXIS 49938 at *53-*58 (same); *Spalding v. City of Chicago*, 186 F. Supp.3d 884, 916-17 (N.D. Ill. 2016)(relying heavily on opinion of one expert).[15]  Plaintiff cites no case finding a "public record" alone sufficient to establish a code of silence or render unnecessary the sort of discovery conducted in *Obrycka*, *Cazares* and *Spalding*.[16]

Neither the DOJ Report nor the PATF Report nor any other aspect of Plaintiff's purported public record sets forth anything like the sort of expert analysis considered in *Obrycka*, *Cazares* and *Spalding*.  Moreover, the pervasive code of silence alleged by Plaintiff simply cannot be reconciled with the acknowledgement in the DOJ and PATF Reports of "the countless good officers within CPD who police diligently every day, and who disapprove of some officer conduct they see…"  DOJ Report, p. 4; PATF Report, p. 1 ("… many dedicated CPD officers who show up to work every day to serve and protect the community").  Not surprisingly, the DOJ Report is far more circumspect than plaintiff, acknowledging that it could not "determine the exact contours of this culture" or "its precise impact on specific cases."  DOJ Report, p. 75.  And Plaintiff's "public record" does not speak to specific issues here, such as whether the alleged code of silence existed when and

---

[15] Plaintiff's other cited decisions simply denied motions to dismiss *Monell* claims – *Klingler v. City of Chicago*, 2017 USDistLEXIS 125338 at *2 - *13 (N. D. Ill. August 8, 2017); *Spearman v. Elizondo*, 230 F. Supp.3d 888, 891-96 (N.D. Ill. 2016); *Maglaya v. Kumiga*, 2015 US Dist.LEXIS 101217 at *14 - *17 (N.D. Ill. August 3, 2015) – or denied a motion to depose the Mayor.  *LaPorta v. City of Chicago*, 2016 U.S. Dist.LEXIS 111297 at *3-*7 (N.D. Ill. August 22, 2016).  None of these decisions discussed bifurcation.

[16] While it is certainly true that the *Cazares* court cited the DOJ and PATF Reports and certain statements by the Mayor, these materials appear to have been an afterthought in the court's analysis.  *Cazares*, 2017 U.S.Dist.LEXIS 49938 at *58.

where the underlying incident occurred or is even relevant to Defendant Officer Al Farah, who did not become an officer until 2013.

Finally, Plaintiff fails to address the immense burden on the City of rebutting Plaintiff's claimed *de facto* code of silence, which will be similar to rebutting Plaintiff's failure to discipline claim, *see supra*, and thus supports bifurcation. *Kitchen v. Burge*, 10 C 04093, R. 399 (Nov. 2, 2012) Order, R. 28, Exhibit C, p. 12.

### C. Bifurcation Would Be Neither Duplicative Nor Unduly Burdensome

Plaintiff argues that his individual and *Monell* claims factually overlap and bifurcation therefore will result in duplicative proceedings and discovery disputes. *Id.*, p. 11-14. These contentions are without merit. Plaintiff is indeed entitled as part of individual claim discovery to inquire into the Defendant Officers' disciplinary histories, training and compliance with policies. *Id.*, p. 12. But it does not follow from this that Plaintiff's individual and *Monell* claims overlap in any meaningful way. To the contrary, as demonstrated *supra*, Plaintiff must try to establish his alleged *de facto* policies by materials and alleged incidents that have nothing to do with the incident underlying his individual claims. Bifurcating such distinct claims will lead neither to cognizable duplication nor discovery disputes.[17]

---

[17] Plaintiff's cited cases are inapposite. *Awalt v. Marketti*, 2012 USDistLEXIS 49182 at *2, *38-*45 (N.D. Ill. April 9, 2012) (bifurcation denied partly because of "two rounds" of proceedings, but: plaintiff could succeed under *Monell* without succeeding on individual claims because private care providers' practices may have independently harmed plaintiff, plaintiff had a "far greater … incentive" to pursue *Monell* claims" because punitive damages were available and discovery of private care provider practices would have to proceed anyway); *Young v. City of Chicago*, 13 C 5651, p. 3-4 (N.D. Ill. January 6, 2016) (denying bifurcation at least partly because settlement ("the ultimate in judicial economy") more likely and fewer cases likely would be filed or tried); *Cadiz*, 2007 U.S.Dist.LEXIS 88458 at *11 - *13 ("only a few" of plaintiff's "nearly 100 potential witnesses" were

**D. Non-Economic Benefits/Pragmatism Do Not Support A Unitary Proceeding**

The non-economic benefits of Plaintiff's *Monell* claim and pragmatism do not support a unitary proceeding. Bifurcation does not deprive Plaintiff of any *Monell* benefits because "[b]ifurcation does not mean dismissal" and Plaintiff "will be free to pursue his *Monell* claim" if he prevails on any individual claim. *Golatte* 17 C 929, R. 39, R. 28, Exhibit A, p. 4. The importance of such benefits is, however, reduced because Plaintiff's suit is one of many efforts addressing the same topics and thus of reduced non-economic value. Finally, Plaintiff will remain master of his complaint; bifurcation simply sequences, and does not eliminate, claims.[18]

**E. Prejudice To Defendants Warrants Bifurcation; Plaintiff Will Not Be Prejudiced**

Plaintiff's contention that defendants will not be prejudiced by a unitary proceeding but Plaintiff will be prejudiced by bifurcation is without merit. R. 38, p. 18-21. In a unitary trial the Officer Defendants, in particular, would suffer ruinous prejudice. Plaintiff will try to admit numerous other alleged incidents of police misconduct and/or mismanagement, virtually all concerning other officers, and the jury then will be asked if such other incidents show *de facto* policies that caused

---

"identified as relevant solely to ... *Monell*"; discovery was proceeding in parallel suit against same officers for same incident; and City apparently already familiar with at least one expert); *Estate of McIntosh*, 2015 USDistLEXIS 116780 at *28 - *31 (claims of massive discovery burden non-specific and speculative); *Estate of Loury*, 2017 USDistLEXIS 60459 at *9 - *12 (same).

[18] Plaintiff asserts, citing many decisions, that "numerous Judges in this District have denied similar ... motions ..." R. 38, p. 16-17. This argument does nothing to advance Plaintiff's cause. Of course there are decisions denying bifurcation, just as there are decisions granting bifurcation. The City has never contended otherwise but rather argues bifurcation is proper in *this* case. If anything, Plaintiff's long list of citations simply highlights his failure to meaningfully address, much less distinguish, *Golatte.*

Defendant Officers' alleged acts. Thus, in considering at least the cause of Defendant Officers' alleged acts, the jury will be asked to consider vast other acts evidence concerning other officers. It is difficult to see how any instruction could protect the Defendant Officers under such circumstances; consideration of vast other acts evidence involving other officers in adjudicating the individual claims seems inevitable. *Cf.* Kitchen *v. Burge*, 10 C 04093, R. 399, R. 28, Exhibit C, p. 13 (instructions limiting consideration of *Monell* evidence "on top of" Rule 404(b) instructions "would only add complexity ... and substantially exacerbate the potential for juror confusion").[19] Bifurcation will "ensure that the ... [Defendant Officers] ... are not prejudiced unfairly by the presentation of evidence that does not relate to" their alleged conduct, *Kitchen v. Burge*, 10 C 04093, R. 399, R. 28, Exhibit C, p. 13-14, and "reduce the potential ... that the City or the ... Defendant [Officers] will be found liable by association." *Golatte* 17 C 929, R. 39, R. 28, Exhibit A, p. 4.

By contrast, as recognized in *Golatte*, bifurcation will not deny Plaintiff his *Monell* claim or otherwise prejudice Plaintiff because "[b]ifurcation does not mean dismissal" and Plaintiff will be "free to pursue his *Monell* claim..." if he prevails on any individual claim. *Golatte* 17 C 929, R. 39, R. 28, Exhibit A, p. 4.

Date: January 10, 2018.                    By: /s Timothy P. O'Connor
Timothy P. O'Connor
MEYER & O'CONNOR, LLC
332 S. Michigan Ave., Suite 1150
Chicago IL 60604
312-346-9000

---

[19] Plaintiff argues that any assessment of trial prejudice is premature but never explains why this is so or denies that he will seek to introduce massive amounts of other acts evidence involving other officers. Plaintiff's *Monell* allegations (R. 1, ¶ 34-38) and Response (R. 38) make clear that a unitary trial would be highly prejudicial, as explained above.

CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby states that he caused a copy of the foregoing DEFENDANT CITY OF CHICAGO'S REPLY IN SUPPORT OF BIFURCATION to be served upon:

Shubra Ohri
G. Flint Taylor
People's Law Offices
1180 North Milwaukee
Chicago IL 60642

by electronic service through the Court's ECF filing system on this 10th day of January, 2018.

/s Timothy P. O'Connor