Exhibit D
Testimony of Officer Tena Al Farah
in *People v. Smith*, 15 CR 18796

```
1                           OFF. AL FARAH,

2       called as a witness on behalf of the People, having been

3       first duly sworn, was examined and testified as follows:

4                          DIRECT EXAMINATION

5                                BY

6                          MR. JANNUSCH:

7           Q.      Please introduce yourself to the Ladies and

8       Gentlemen of the jury, spelling your first and last name

9       for the court reporter?

10          A.      My name is Officer Al Farah, first name is

11      Tena, first name is T-e-n-a, last name A-l F-a-r-a-h,

12      Star 17773.

13          Q.      Who do you work for?

14          A.      I currently work for the Chicago Police

15      Department.

16          Q.      And where are you currently assigned?

17          A.      Currently assigned to the Gang Investigations

18      Division.

19          Q.      Where were you assigned before that?

20          A.      Prior to that I was in the 19th District.

21          Q.      The 19th District?

22          A.      Yes.

23          Q.      And prior to that, where were you?

24          A.      The 10th District.
```

1      Q.    Okay.

2         And directing your attention to October 8,

3  2015, which district were you assigned to on that date?

4      A.    The 10th District.

5      Q.    At approximately 9:45 p.m. on that date at or

6  near the location of 4036 West 21st Place in Chicago,

7  Illinois, Cook County, were you working and on duty that

8  day?

9      A.    Yes, I was.

10     Q.    And were you working alone or with partner?

11     A.    I was working with a partner.

12     Q.    What is your partner's name?

13     A.    Officer Julie Gonzalez, Star No. 7923.

14     Q.    Were you in a vehicle that day?

15     A.    Yes, we were.

16     Q.    Was it marked or unmarked?

17     A.    Marked vehicle.

18     Q.    How were you dressed that day?

19     A.    I was dressed in a similar uniform with our

20  insignias and patches, and I had my vest on that shows my

21  star and my name on there.

22     Q.    All right.

23         Did you have a utility belt?

24     A.    Yes, I did.

```
 1          Q.    What was on that?

 2          A.    It has my duty weapon, it has a taser, it has

 3     my baton and my pepper spray.

 4          Q.    All right.

 5                And were you driving or a passenger in the

 6     vehicle that day?

 7          A.    I was a passenger.

 8          Q.    And what brought you to that location?

 9          A.    We heard a call of -- we went to assist

10     officers since a call came out over the radio to assist

11     an officer.

12          Q.    Could you hear those officers on the radio?

13          A.    Yes, we can.

14          Q.    After you heard those officers, what did you

15     do?

16          A.    We started driving towards the location that

17     was given out.

18          Q.    All right.

19                But you said you weren't driving, correct?

20          A.    My partner was driving.  I was a passenger.

21          Q.    And did you get to that location?

22          A.    Yes, we did.

23          Q.    And as you approached in your vehicle, can you

24     tell the Ladies and Gentlemen of the jury what you
```

```
 1    observed?

 2         A.    As my partner and I were approaching I

 3    observed both Officers Zuniga and Francone and the man in

 4    the yard.

 5         Q.    Do you see that man in the yard here in court?

 6         A.    Yes, I do.

 7         Q.    Can you point to that individual and describe

 8    an article of clothing is wearing?

 9         A.    It's the gentleman sitting next to counsel

10    with the gray sweater on.

11         MR. JANNUSCH:   Judge, if there could be an in-court

12    identification of the defendant?

13         THE COURT:   The record will so reflect.

14         BY MR. JANNUSCH:

15         Q.    Thank you, Judge.

16               Besides the defendant and two other officers,

17    did you see anybody else when you approached?

18         A.    As I was approaching I had my attention drawn

19    to the officers and at the subject.

20         Q.    Why was that?

21         A.    Because as I'm approaching I observed the

22    defendant like swinging his arms around, he was moving,

23    just around, trying to not be physically controlled.

24         Q.    All right.   And did you stay in your car or
```

1    did you get out of your car?

2           A.    I got out of the car.

3           Q.    Can you tell the Ladies and Gentlemen what you

4    did next?

5           A.    As I exited my vehicle I ran towards, I ran

6    towards over to the house where I observed both officers

7    and the defendant, and I just observed him moving and

8    like being aggressive by swinging his arms around, and I

9    felt like one of the officers was in imminent threat of

10   receiving a battery.

11          Q.    When you say he, you mean the defendant,

12   correct?

13          A.    Yes.

14          Q.    All right.

15                And what did you do next?

16          A.    As I continued to observe, I observed the

17   defendant push one of the officers.  I got my taser out

18   and I warned the defendant several times.

19          Q.    How did you warn him?  What did you say?

20          A.    I asked him to comply or I'm going to tase

21   him.  Comply or I'm going to tase him, multiple times.

22          Q.    And did he comply?

23          A.    He did not comply.

24          Q.    What happened next?

1       A.    After that I gave him several more warning by

2   telling him, taser, taser, taser, and I discharged my

3   taser.

4       Q.    All right.  And where were Officer Francone

5   and Zuniga at this time?

6       A.    After given, saying, taser, taser, taser,

7   which is a warning, Officers Zuniga and Francone moved

8   away and the defendant got tased.

9       Q.    All right.

10       Was the defendant facing you or did he have

11   his back to you?

12       A.    He was facing me.

13       Q.    All right.  And where did you aim the taser?

14       A.    I aimed the taser to his front lower center

15   mass.

16       Q.    When say the front lower center mass, can you

17   describe to the Ladies and Gentlemen what that is

18   exactly?

19       A.    Front lower center mass is under where, under

20   the chest and above the knee area.

21       Q.    And why did you aim in that location?

22       A.    We aim in that location to avoid hitting any

23   vital organs, and minimal injuries will occur in that

24   area.

```
1         Q.    All right.

2               And you said that the -- you fired your taser;

3    is that correct?

4         A.    Yes.

5         Q.    Did the tasers -- what happened next?  Did

6    they --

7         A.    After discharging the taser, both of the

8    prongs that get discharged from the taser hit the

9    defendant, and  --

10        Q.    Where did they hit him?

11        A.    One hit him in his abdominal area, and the

12   second prong in the upper pelvis area.

13        Q.    And this was the area you aimed at, is that

14   correct?

15        A.    I aimed at the, yes.

16        Q.    And why did you pull your taser?

17        A.    I pulled the taser because it, I felt it was

18   one of the tools that will cause minimal injury and will

19   be effective.

20        Q.    Okay.  Is there a reason you pulled your taser

21   instead of your gun?

22        A.    Yes.  It's less lethal.

23        Q.    Can you describe to the Ladies and Gentlemen

24   of the jury, what is a taser?
```

1      A.    A taser is a device that, to help us control

2   and subdue a defendant, and it uses electrical impulses

3   which causes contractions, muscle contractions.

4      Q.    What is the difference between a taser and a

5   gun?

6      A.    A taser, obviously, it shoots like -- it's

7   electrical, while a gun is a lethal weapon.

8      Q.    And does every officer carry a taser?

9      A.    Every trained officer carries a taser.

10     Q.    All right.  Is there enough tasers for every

11  officer?

12     A.    No, there is not.

13     Q.    All right.  And why were you assigned a taser

14  that day?

15     A.    It was between me and my partner who, it's one

16  taser per car at that time.  It was, one of us will carry

17  it.  Since I was a passenger, I'm more accessible to it,

18  and my hand is like more freely to access my taser.

19     Q.    All right.  So you were armed with a taser and

20  not your partner; is that correct?

21     A.    Yes, I was.  Uh-huh.

22     Q.    And you said that officers can carry a taser

23  as long as they're trained?

24     A.    Yes.

133

1      Q.    Can you describe the training you received to
2  use a taser?
3      A.    Our initial training was an eight hour
4  training which a lot of us get in the Academy, or we
5  could get that afterwards.  It includes knowing how to
6  use a taser, the parts of the taser, and effectiveness of
7  the taser.
8      Q.    Did you receive any training after that?
9      A.    Yes, I did.
10     Q.    And how often do you receive training?
11     A.    Annually.
12     Q.    And during your first initial training, when
13  was that?
14     A.    That was in 2013.
15     Q.    You said that's when you were at the Academy;
16  is that correct?
17     A.    Yes.
18     Q.    Did you volunteer for anything during that
19  training?
20     A.    During the training I volunteered to get
21  tased.
22     Q.    All right.  and why did you do that?
23     A.    I wanted to know the kind of force I am going
24  to apply on defendants.

134

1      Q.    Why did you want to know that?

2      A.    I just wanted to know how it feels to be, to

3   get tased, and to know the effectiveness of it.

4      Q.    And when is it appropriate to use a taser in

5   the field?

6      A.    It's appropriate to use a taser whenever a

7   subject is resisting, constantly resisting, or when he

8   becomes an assailant.

9      Q.    All right.  And is that why you used the taser

10  in this case?

11     A.    Yes.

12     Q.    How far away from the defendant were you when

13  you used this device?

14     A.    Approximately between eight and ten feet, not

15  exactly sure.

16     Q.    Okay.

17           What if anything -- strike that.

18           After you fired your taser, what did the

19  defendant do?

20     A.    The defendant slowly began to drop to the

21  ground.

22     Q.    All right.

23     A.    He didn't immediately drop to the ground.  He

24  slowly went down to the ground.

135

1      Q.    What did your partners do?

2      A.    As he's being tased, Officers Zuniga and

3   Francone try to handcuff him.

4      Q.    Was the defendant completely subdued after he

5   was tased?

6      A.    No, he was not.

7      Q.    Can you describe what was happening?

8      A.    As he was going down, both Officer Zuniga and

9   Officer Francone were, each grabbed an arm, but they

10   still had slight resistance.

11      Q.    Were you ready to tase him again if need be?

12      A.    If needed, yes.

13      Q.    Is there a reason you did not?

14      A.    I did not tase him again.  I felt the officers

15   could have handled him at that time.

16      Q.    Were they able to place him in handcuffs

17   eventually?

18      A.    Yes, they were.

19      Q.    And during that time, were you giving any

20   verbal commands?

21      A.    No.

22      Q.    Was your partners giving verbal commands?

23      A.    Yes, they were.

24      Q.    That was to the defendant?

136

```
 1        A.     Yes.
 2        Q.     Was the defendant complying immediately?
 3        A.     At that point, he was not.  After he was
 4   cuffed, he was now, he's under arrest, so he was more
 5   compliant.
 6        Q.     After he was cuffed?
 7        A.     After he was cuffed.
 8        Q.     Did other officers arrive on the scene?
 9        A.     Yes.
10        Q.     And was there a supervisor on the scene?
11        A.     Yes.
12        Q.     And who was that?
13        A.     It was Sergeant Hernandez.
14        Q.     Was he made aware that the taser was used?
15        A.     Yes.
16        Q.     After that, what happened next?
17        A.     After that my partner and I transported the
18   defendant back to the station.
19        Q.     And were you meeting anybody back at the
20   station?
21        A.     We were meeting CFD, ambulance.
22        Q.     When you say CFD --
23        A.     Chicago Fire Department.
24        Q.     And the ambulance was meeting you at the
```

```
1       Q.    What did your partners do?
2       A.    As he's being tased, Officers Zuniga and
3   Francone try to handcuff him.
4       Q.    Was the defendant completely subdued after he
5   was tased?
6       A.    No, he was not.
7       Q.    Can you describe what was happening?
8       A.    As he was going down, both Officer Zuniga and
9   Officer Francone were, each grabbed an arm, but they
10  still had slight resistance.
11      Q.    Were you ready to tase him again if need be?
12      A.    If needed, yes.
13      Q.    Is there a reason you did not?
14      A.    I did not tase him again.  I felt the officers
15  could have handled him at that time.
16      Q.    Were they able to place him in handcuffs
17  eventually?
18      A.    Yes, they were.
19      Q.    And during that time, were you giving any
20  verbal commands?
21      A.    No.
22      Q.    Was your partners giving verbal commands?
23      A.    Yes, they were.
24      Q.    That was to the defendant?
```

1      A.    Yes.

2      Q.    Was the defendant complying immediately?

3      A.    At that point, he was not.  After he was

4  cuffed, he was now, he's under arrest, so he was more

5  compliant.

6      Q.    After he was cuffed?

7      A.    After he was cuffed.

8      Q.    Did other officers arrive on the scene?

9      A.    Yes.

10     Q.    And was there a supervisor on the scene?

11     A.    Yes.

12     Q.    And who was that?

13     A.    It was Sergeant Hernandez.

14     Q.    Was he made aware that the taser was used?

15     A.    Yes.

16     Q.    After that, what happened next?

17     A.    After that my partner and I transported the

18  defendant back to the station.

19     Q.    And were you meeting anybody back at the

20  station?

21     A.    We were meeting CFD, ambulance.

22     Q.    When you say CFD --

23     A.    Chicago Fire Department.

24     Q.    And the ambulance was meeting you at the

```
 1    station?
 2         A.    Yes.
 3         Q.    And was the defendant taken anywhere in the
 4    ambulance once you got to the station?
 5         A.    He was transported to Mount Sinai.
 6         Q.    Approximately what time did the ambulance
 7    arrive?
 8         A.    I believe it was 10:10 p.m.
 9         Q.    10:10 p.m.?
10         A.    Yes.
11         Q.    So roughly 20 minutes after the incident, is
12    that correct?
13         A.    Yes.
14         MR. JANNUSCH:  And Judge, if I may have a moment?
15         THE COURT:  Sure.
16                              (Short pause.)
17         MR. JANNUSCH:  No further questions for this
18    witness.
19         THE COURT:  Cross-examination?
20                        CROSS EXAMINATION
21                              BY
22                        MR. URDANGEN:
23         Q.    So you were at the Academy in 2013?
24         A.    Yes.
```

138

1    Q.    When were you sworn in as a police officers?

2    A.    Our graduation was sometime in February of

3    2014.

4    Q.    And so how long have you been on active duty

5    as police officer?

6    A.    Active duty, I graduated, I received my star

7    in December of 2013, so December 2013, but our graduation

8    ceremony is not until February.

9    Q.    So you received some taser training at the

10   Academy?

11   A.    Yes.

12   Q.    Like everybody?

13   A.    Yes.

14   Q.    And then you get it annually after that?

15   A.    Yes.

16   Q.    When did you get your first annual taser

17   training after you were sworn in?

18   A.    I don't recall the exact date.

19   Q.    Approximately?

20   A.    Approximately, it would be August or September

21   of 2014.

22   Q.    And you did it a year later after that, too?

23   A.    Yes.

24   Q.    And a year later after that?

1      A.    Yes.

2      Q.    So how long have you been -- since you have

3  been a police officer, how long have you been assigned to

4  carry a taser?

5      A.    I could carry a taser whenever there is one

6  ready and available.

7      Q.    How many times have you used it?

8      A.    That was the one and only time I've used my

9  taser.

10     Q.    You over-reacted, didn't you, Officer?

11     A.    I did not overreact, no.

12     Q.    Don't the rules of your police department

13  indicate when at all possible you should fire your taser

14  at a subject's back?

15     A.    That's if his back is accessible, but I was

16  facing the defendant.

17     Q.    But you could have moved around to the back

18  where less injury would be caused, right?

19     A.    I'm sorry?

20     Q.    You could have moved to the back?

21     A.    No, I could not.

22     Q.    You were not in any danger?

23     A.    My colleagues were in danger.

24     Q.    You misunderstood the directions of how to

1 fire a taser at a subject, didn't you?

2   A. No, I did not.

3   Q. By the way, you say you were tased?

4   A. Yes, I was.

5   Q. As part of your training?

6   A. It was an optional part of the training.

7   Q. It is.  And you mentioned, you were asked what

8 a taser does.  It actually interferes with the peripheral

9 nervous system of the body --

10   THE COURT:  You better lay a foundation, before she

11 testifies about the nervous system.

12   BY MR. URDANGEN:

13   Q. Did your learn about what the effects of a

14 taser are at the Academy?

15   A. They mentioned it does  --

16   Q. I'm just asking if you learned about it?

17   A. We did, yes.

18   Q. Did you get a course on the neurophysiology of

19 a victim being tased?

20   A. No.

21   Q. You don't know, really know what the effects

22 are other than your own experience, right?

23   A. To a certain point.

24   Q. Well, are you -- let me ask you this.  Are you

1    aware when a taser such as the one you deployed is used

2    on somebody and two of those darts go into their skin,

3    that that person experiences convulsions that render him

4    unable to control his movements?

5         A.    That's the intention.

6         MR. JANNUSCH:  Objection.

7         THE COURT:  The objection is sustained.  She doesn't

8    have a foundation that you have laid at this time, and

9    you --

10        BY MR. URDANGEN:

11        Q.    I don't know if I can.

12              You don't know, do you, what the

13   neuro-physiological effect are on a person who's been

14   tased?

15        A.    Not really.

16        Q.    Right.

17              So when you say that you saw him still moving

18   a little bit after he was tased, you don't know whether

19   or not that's because he couldn't control his movements,

20   correct?

21        A.    Possibly.

22        Q.    Okay.

23              Incidentally, when you were tased, you weren't

24   tased with the kind of taser and darts that Mr., that you

                              142

1    tased Mr. Smith with, were you?

2        A.    No.

3        Q.    No.  You didn't have to experience those darts

4    going into your skin, did you?

5        A.    No.

6        Q.    You didn't convulse when you got tased?

7        A.    No, I did.

8        Q.    How were you tased?

9        A.    The taser that was used when I got tased,

10    alligator clamps attached to our clothing and gave the

11    same effect as a regular taser would.

12        Q.    How do you know that?

13        A.    Part of training.

14        Q.    You have never experienced having darts

15    penetrate your skin in two parts of your body from a stun

16    gun, have you?

17        A.    No.

18        Q.    Isn't -- doesn't part of your training involve

19    analyzing the totality of the circumstances before you

20    fire this dangerous weapon?

21        A.    Yes.

22        Q.    Did you do that?

23        A.    I did.

24        Q.    Didn't you have your gun out when you got out

1    of the car?

2         A.    No, I did not.

3         Q.    No?

4               Were you told to arm your taser before you got

5    there?

6         A.    No.

7         Q.    So you made that decision right there on the

8    spot, right?

9         A.    I did, yes.

10        Q.    You had time to analyze all of the situations

11   that existed that could have mitigated the harm to Jeff

12   Smith, right?

13        A.    Well, I analyzed the situation and I believe

14   my use of force was appropriate at that time.

15        Q.    Don't the rules of your department require

16   that the, that medical emergency personnel come directly

17   to the scene where a person is tased?

18        A.    I believe so.

19        Q.    And that didn't happen here, did it?

20        A.    No.

21        Q.    And you're the taser officer responsible for

22   making sure that happens, aren't you?

23        A.    Yes.

24        MR. URDANGEN:  Okay.  Thank you.

1          Can I have a moment, please, Judge?

2          THE COURT:  Sure.

3                              (Short pause.)

4          BY MR. URDANGEN:

5          Q.   You'll concede that Jeff Smith was injured by

6     your taser, right?

7          A.   He got injured by the two prongs, yes.

8          Q.   Yes.

9               And you filled out a tactical response report;

10    that's part of your obligation, is it not?

11         A.   Yes, it is.

12         Q.   And doesn't that list the various types of

13    ways that the taser can be employed?

14         A.   Yes.

15         Q.   One of those is a spark displayed, right?

16         A.   Yes.

17         Q.   Another one of those is contact stun, right?

18         A.   Yes.

19         Q.   And another one of those is probe discharge,

20    right?

21         A.   Yes.

22         Q.   And the order that I just read to you is from

23    the least serious and harmful to the most serious and

24    harmful in ways that the taser can be deployed, right?

```
 1          A.    Yes.

 2          Q.    And you chose the most serious, the situation

 3    more likely to injure him more severely, didn't you?

 4          A.    It's not like that.  From the position where I

 5    was, that's the option that I had.

 6          Q.    I see.

 7                But you could have done one of the first two

 8    that I read, right?

 9          A.    If I was a little closer, possibly.  But I was

10    not.

11          Q.    But you could have gotten closer, right?

12          A.    Possibly, but  --

13          Q.    And you possibly could have gotten around to

14    his back, right?  Where less damage would have been done?

15          A.    From where I was standing, no, but --

16          Q.    But?

17          A.    I could have possibly, at the time, but he was

18    actively resisting go around the fence and use my taser

19    at that point.

20          Q.    Did you learn something from this first time

21    on using the taser?

22          A.    Learn what?

23          Q.    Will you be try to be more careful next time?

24          A.    I was very careful.
```

1          THE COURT:   Objection.

2          THE COURT:   The answer will stand.

3          MR. URDANGEN:   Thank you.

4               Nothing else.

5          THE COURT:   Re-direct?

6          MR. JANNUSCH:   Nothing based on that.

7               Thank you.

8                              (Witness excused.)

9          THE COURT:   State, call your next witness.

10         MR. JANNUSCH:   The State will call Lt. Peabody.

11

12

13

14

15

16

17

18

19

20

21

22

23

24